**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; CHARLES A. WHOBREY, | ) ) ) | |
| Plaintiffs, | ) | No. 1:22-CV-06133 |
| v. | ) ) | Judge Edmond E. Chang |
| EVENT MEDIA, INC.; and PACK EXPO SERVICES, LLC, | ) ) | |
| Defendants | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Central States, Southeast and Southwest Areas Pension Fund and Charles A. Whobrey, one of its trustees, filed complaints (in two separate cases) to modify or enforce arbitration awards against Event Media, Inc. and Pack Expo Services, LLC. R. 1, Compl.; R. 17, Agreed Mot., Exh. C. At around the same time, Event Media and Pack Expo each filed their own separate lawsuits against the Fund to vacate or modify the same respective arbitration awards. Agreed Mot., Exhs. A, B. The disputes are about the Fund's calculation of withdrawal liability payments under the Employee Retirement Income Security Act, as amended by the Multiemployer Pension Reform Act of 2014. Given the overlapping issues, the cases were consolidated. R. 20, Order. The parties filed competing motions to modify, enforce, or vacate the awards, along with (gratefully) the parties' joint stipulated facts.[1] R. 24, Joint Stip.; R. 25, Pls.' Event Media Mot.; R. 26, Pls.' Pack Expo Mot.; R. 28, Event Media Mot.; R. 29 Pack

---

[1]This Court has jurisdiction under 29 U.S.C. §§ 1401(b)(2) and 1451(c).

Expo Mot.[2] For the reasons discussed below, the Fund's motions to enforce or modify the awards are denied, and Event Media and Pack Expo's motions to vacate are granted.

## I. Background

Event Media and Pack Expo were contributing employers to the Central States, Southeast and Southwest Areas Pension Fund. R. 24-1, Joint Stip., Exh. A ¶ 6; R. 24-11, Joint Stip., Exh. E ¶ 6. In 2008, the Fund's actuary certified that the Fund was in "critical" status (the actual term used in the statute), and the Fund was thus subject to a rehabilitation plan under 29 U.S.C. § 1085(a)(2), (b)(2). Joint Stip., Exh. A ¶¶ 10, 11, Exh. E ¶¶ 10, 11. The rehabilitation plan outlined three contribution rate schedules for employers; under the primary and default schedules, the employers' contribution rates had a compound yearly increase. Joint Stip., Exh. A ¶ 12, Exh. E ¶ 12. Between 1986 and 2003, Event Media's and Pack Expo's accrued-benefit rate was 2% of their contributions (per worker-participant) made to the Fund. Joint Stip., Exh. A ¶ 9, Exh. E ¶ 9. In 2004, the parties modified their agreements to provide an accrued-benefit rate of 1% of contributions. Joint Stip., Exh. A ¶ 8, Exh. E ¶ 8. The 2008 rehabilitation plan retained the 1% accrued-benefit rate and the plan has not been amended since 2008 to increase benefits or future benefit accruals for employers. Joint Stip., Exh. A ¶¶ 8, 13, Exh. E ¶¶ 8, 13.

---

[2]For convenience, amongst the various litigant-party hats worn by the Fund and the companies, this decision refers to the Fund as the Plaintiff and Event Media and Pack Expo as the Defendants when citing to the record documents.

In 2019, the Fund's actuary certified that the Fund was in critical and declining status and projected insolvency by 2025. Joint Stip., Exh. A ¶ 14, Exh. E ¶ 14. The same year, Event Media and Pack Expo withdrew from the Fund and thus incurred withdrawal liability obligations. Joint Stip., Exh. A ¶ 15, Exh. E ¶ 15. Both Event Media and Pack Expo had a weekly contribution rate of $328 as of December 31, 2014; $356 in 2015, $376 in 2016, $392 in 2017, $408 in 2018, and $424 in 2019. Joint Stip., Exh. A ¶ 7, Exh. E ¶ 7. The Fund used the weekly contribution rate of $424 when calculating the employers' withdrawal liability payments, which took effect in the 2019 plan year under the primary schedule of the rehabilitation plan. Joint Stip., Exh. A ¶¶ 15–17; Exh. E ¶¶ 15–17.

The parties disagreed (and still do) about how to calculate the employers' withdrawal liability payment under the Multiemployer Pension Reform Act of 2014 and went to arbitration to resolve the dispute. In Event Media's case, the arbitrator found that the Fund could not include all post-2014 contribution rate increases in the highest contribution rate, but could include those portions of the increases that were used to fund an increase in benefits. R. 24-20, Joint Stip., Exh. H at 10–12. In Pack Expo's case, a different arbitrator found that the Fund could include all post-2014 contribution rate increases. R. 24-10, Joint Stip., Exh. D at 5–6.[3] Pack Expo and Event Media seek to have the awards vacated and their withdrawal liability payments recalculated using the 2014 contribution rate of $328. R. 28, Event Media Mot. at 3; R. 29 Pack

---

[3]In at least nine other arbitration decisions not involving Pack Expo and Event Media, the arbitrators found that no post-2014 contribution rate increases could be considered in calculating withdrawal liability payments. *See* R. 30, Def.'s Br., Exhs. A, B, C, D, E, F; R. 38, Def.'s Mot. to Cite Supp. Authority.

Expo Mot. at 3. The Fund seeks to modify the Event Media award to calculate the withdrawal liability payment using the 2019 contribution rate of $424, or in the alternative to at least authorize rate increases for those parts of the post-2014 contributions that increased benefit accruals.[4] R. 25 Pls.' Event Media Mot. at 4–5. The Fund seeks to enforce the Pack Expo award or in the alternative to modify it using the portions of the post-2014 contribution rate increases that were used to fund an increase in benefit accruals.[5] R. 26 Pls.' Pack Expo Mot. at 5.

## II. Standard of Review

Any party to an arbitration proceeding that resolved a dispute about withdrawal liability from a multiemployer pension plan may bring an action in district court within 30 days "to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). The arbitrator's findings of fact are presumed correct and are "rebuttable only by a clear preponderance of the evidence." § 1401(c). Legal questions are subject to *de novo* review in district court. *Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 667 (7th Cir. 2005). Here, there are no factual disputes. *See* Joint Stip. The parties seek review of the arbitrators' statutory interpretation of 29 U.S.C. § 1085(g) as it applies to post-2014 withdrawal liability

---

[4]Modifying the award as requested amounts to 240 monthly payments of $7,957.34; enforcing the award amounts to 240 monthly payments of $7,332.76. R. 25, Pls.' Event Media Mot. ¶¶ 12, 13.

[5]Enforcing the award amounts to 240 monthly payments of $12,477.57; modifying the award as requested amounts to 240 monthly payments of $11,498.20. R. 26 Pls.' Pack Expo Mot. ¶¶ 12, 14.

payments, which is a matter of first impression in this district (and, it appears, in any federal court).

## III. Analysis

The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, "helped assure private-sector workers that they would receive the pensions that their employers had promised them." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995) (cleaned up).[6] One mechanism for maintaining funding was to hold those employers that withdrew from insolvent plans "liable for a fair share of the plan's underfunding" if they withdrew in the five years leading up to insolvency. *Id.* Inadvertently, this encouraged employers "to withdraw from a financially shaky plan and risk paying [their] share if the plan later became insolvent, rather than remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Id.* at 416–17. As a result, "a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Id.* at 417 (cleaned up).

In response, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 "to protect the financial solvency of multiemployer pension plans." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997). Under the statute, employers who withdraw from underfunded pension plans must make withdrawal liability payments, "to discourage withdrawals

---

[6] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

*ex ante* and cushion their impact *ex post.*" *Id.* at 201 (cleaned up). These payments are set "at a level that roughly matches the employer's proportionate share of the plan's unfunded vested benefits," *id.* at 196 (cleaned up), "calculated as the difference between the present value of vested benefits and the current value of the plan's assets," *Pension Benefit Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 725 (1984) (cleaned up). Employers may pay the withdrawal liability as a lump sum or in installments, which are calculated in part using the employer's "highest contribution rate" in the 10 years before the withdrawal. *See* 29 U.S.C. § 1399(c)(1)(C)(i)(II).

Congress later enacted the Pension Protection Act of 2006 to increase funding levels for severely underfunded multiemployer pension plans. *See* 29 U.S.C. § 1085; *Lehman v. Nelson*, 862 F.3d 1203, 1207 (9th Cir. 2017). Depending on the funding level, the statute requires that the funds adopt a "funding improvement plan" or "rehabilitation plan" that includes "revised benefit structures" or "contribution structures" for employers to increase the plans' funding. 29 U.S.C. § 1085(a), (c)(1)(B), (e)(1)(B). But by reducing plans' unfunded vested benefits through increased employer contribution rates, the Pension Protection Act paradoxically also increased employers' withdrawal liability payments (which are calculated using the employers' highest contribution rate). Although Congress designed withdrawal liability payments to correspond with the employer's share of unfunded vested benefits, *see Bay Area Laundry*, 522 U.S. at 196, employers' withdrawal liability payments went up as unfunded vested benefits went down under the Pension Protection Act's funding improvement and rehabilitation plans, *see* Methods for Computing Withdrawal

Liability, Multiemployer Pension Reform Act of 2014, 86 Fed. Reg. 1256, 1264 (Jan. 8, 2021). The Multiemployer Pension Reform Act of 2014 addressed this by excluding some contribution rate increases from the withdrawal liability payment calculation. *Id.*; 29 U.S.C. § 1085(g). The parties in this case dispute how to calculate withdrawal liability payments under 29 U.S.C. § 1085(g).

Section 1085(g) outlines the adjustments from funding improvement plans and rehabilitation plans that should be "disregarded in withdrawal liability determination." For contribution increases, "[i]n general":

> Any increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded in determining … the highest contribution rate under section 1399(c) of this title ….

§ 1085(g)(3)(A). This general rule is qualified by "special rules":

> For purposes of this paragraph, any increase in the contribution rate (or other increase in contribution requirements) shall be deemed to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan except for increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided or additional contributions are used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B).

§ 1085(g)(3)(B). The statute's general rule is that "*any* increase in the contribution rate … that is required or made in order to enable to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded" when calculating the highest contribution rate. § 1085(g)(3)(A) (emphasis added). If there was

7

any doubt about which contribution rate increases are disregarded, the special rules go on to clarify that "any increase in the contribution rate ... *shall be deemed* to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation," with two exceptions. § 1085(g)(3)(B) (emphasis added). The first exception is "for increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided." *Id.* The second exception is for "additional contributions ... used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B)." *Id.* These provisions "apply to benefit ... increases in the contribution rate or other required contribution increases that go into effect during plan years beginning after December 31, 2014." Multiemployer Pension Reform Act, Pub. L. No. 113-235, § 109(c), 128 Stat. 2774, 2792 (2014) (codified at 26 U.S.C. § 432 note (Effective Date of 2014 Amendment)).

Reading § 1085(g)(3)(A) and (B) together, any contribution-rate increases in a funding improvement or rehabilitation plan in plan years beginning after December 31, 2014 are "deemed" required for the plans and thus disregarded when calculating the highest contribution rate for withdrawal liability payments, § 1085(g)(3)(B), unless one of the statutory exceptions applies to the increase. The parties agree that the fund had a rehabilitation plan in place from 2008 to 2019, when the employers withdrew from the fund. Joint Stip., Exh. A ¶¶ 11, 15, Exh. E ¶¶ 11, 15. The parties also agree that the employers' contribution rates increased under the rehabilitation plan. Joint Stip., Exh. A ¶¶ 7, 12, 17, Exh. E ¶¶ 7, 12, 17. The employers' contribution-rate

8

increases after 2014, thus must be disregarded in calculating the withdrawal liability payment, unless one of the exceptions under section 1085(g)(3)(B) applies.

Neither party contends that the first exception applies. The parties disagree, however, about the meaning of the exception for increases "permitted by subsection (d)(1)(B) or (f)(1)(B)." 29 U.S.C. § 1085(g)(3)(B). Subsection (d)(1)B) is for funds with funding-improvement plans and is not relevant. Subsection (f)(1)(B) applies to funds with rehabilitation plans, and the Fund contends that the post-2014 contribution rate increases may be included under this exception. R. 27, Pls.' Br. at 11–12. "In general," rehabilitation plans "may not be amended" after they are adopted. 29 U.S.C. § 1085(f)(1)(A). Subsection (f)(1)(B), however, outlines "special rules for benefit increases" allowing amendments to rehabilitation plans, triggered by a required certification by the plan's actuary:

> A plan may not be amended after the date of the adoption of a rehabilitation plan under subsection (e) so as to increase benefits, including future benefit accruals, *unless the plan actuary certifies* that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan.

§ 1085(f)(1)(B) (emphasis added). This provision allows rehabilitation plan amendments "to increase benefits" only if a plan actuary makes certain certifications. *Id.* The parties agree that "the Fund has not adopted a [p]lan amendment to increase benefits or future benefit accruals" since the rehabilitation plan was adopted in 2008. Joint Stip., Exh. A, ¶ 13, Exh. E ¶ 13. In the absence of a plan amendment certified by the plan's actuary, the exception for increased contribution rates "permitted

by … subsection (f)(1)(B)" does not apply to the employers here. 29 U.S.C. § 1085(g)(3)(B).

In response, the Fund argues that the exception for contribution rate increases "permitted by" subsection (f)(1)(B) should be interpreted to include any increase "not prohibited by" this subsection. Pls.' Br. at 11–12; R. 32, Pls.' Reply at 7–8. "As with all questions of statutory interpretation, we start with the text of the statute to ascertain its plain meaning." *United States v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020) (cleaned up). "If the statutory language's plain meaning is unambiguous, our inquiry ends there." *Id.* at 852 (cleaned up). The Fund's interpretation departs from the statutory text and changes its plain meaning. The Fund argues that (f)(1)(B) prohibits rehabilitation-plan amendments that increase benefits without actuary certifications, but otherwise permits any contribution increases. Inverting the use of "permit" and "prohibit" in this way departs from the language of the statute. Section 1085(g)(3) outlines a broad prohibition on including increases and then sets forth two exceptions. Reading the statute's two specific exceptions to allow many more kinds of increases other than those explicitly stated by the statute has no textual support. The Court holds that the exception for contribution increases "permitted by subsection (f)(1)(B)" only applies to those increases actually described in (f)(1)(B): amendments after the adoption of a rehabilitation plan certified by an actuary to meet certain requirements. § 1085(g)(3)(B), (f)(1)(B).

Under that interpretation of the statute, the Fund incorrectly used the post-2014 highest contribution rate of $424 in calculating the employers' withdrawal

10

liability payments, because the post-2014 contribution increases were not the result of a certified rehabilitation plan amendment, but instead had been in place since 2008. Joint Stip., Exh. A ¶¶ 11–13, Exh. E ¶¶ 11–13. In the absence of an applicable exception to the statute's general rule, the employers' post-2014 rate increases are "deemed" to be required for the Fund's rehabilitation plan and disregarded when determining the highest contribution rate for withdrawal liability payments. 29 U.S.C. § 1985(g)(3)(A), (B). In this case, the 2014 rate of $328 must be used to calculate the employers' payments. Joint Stip. Exh. A ¶ 7, Exh. E ¶ 7.

The Fund alternatively argues that because not all of the post-2014 employer contribution-rate increases reduced unfunded vested benefits, the portion of post-2014 increases that funded additional benefit accruals should be included in the withdrawal liability payment calculation. Pls.' Br. at 16–18.[7] But there is even less support in the statutory text for this argument. Instead, the Fund focuses on the statute's overall purpose and cites the Pension Benefit Guaranty Corporation's interpretation of the statute in a proposed regulation—but the interpretation was not ultimately adopted in the final rule. *Id.*; Methods for Computing Withdrawal Liability, Multiemployer Pension Reform Act of 2014, 84 Fed. Reg. 2075, 2081–82 (Feb. 6, 2019); Methods for Computing Withdrawal Liability, Multiemployer Pension Reform Act of 2014, 86 Fed. Reg. 1256, 1264–65 (Jan. 8, 2021). The proposed (but not adopted) rule "required the portion of such contribution increase that is attributable to an increase in

---

[7]The Fund submitted an actuary report calculating the portion of post-2014 rate increases that funded additional benefit accruals, based on the projected amount of total annual contributions and the projected normal costs of funding benefits accrued in that year. *See* R. 24-5, Joint Stip., Exh. A-4; R. 24-15, Joint Stip., Exh. E-4.

benefit accruals to be determined actuarially and for those contribution increases to be included in the calculation of a withdrawn employer's withdrawal liability and annual withdrawal liability payment amount," providing an example for how to calculate the apportionment, regardless of whether the increase was tied to a plan amendment. 86 Fed. Reg. at 1264. Although the PGBC stated that this interpretation was "consistent with ERISA sections 305(d)(1)(B) and 305(f)(1)(B) [29 U.S.C. § 1085(d)(1)(B), (f)(1)(B)]," 84 Fed. Reg. at 2082 n.11, the final rule simply adopts the statutory text and "does not provide further interpretation." 86 Fed. Reg. at 1265. The Fund contends that the final rule was only changed for cost reasons and does not rescind the prior interpretation of the statute. Pls.' Br. at 18. But in explaining the change, the final rule states that "[c]ommenters raised interpretive issues about sections 305(g)(3), 305(d)(1)(B) and 305(f)(1)(B)" and "PGBC is continuing the examine these issues." 86 Fed. Reg. at 1265. This Court is not bound by (nor defers to) the proposed rule's legal interpretation—which was not adopted in a final rule—and the final rule does not clarify the status of that interpretation. Instead, the statutory text of § 1085(g)(3) governs. As discussed above, the statute does not provide for apportionment of contribution rate increases that increase future benefits rather than reduce unfunded vested benefits, in the absence of an actuarially certified plan amendment. *Id.*; 29 U.S.C. § 1085(f)(1)(B).

The Fund rests its argument for including all post-2014 contribution increases (or at least a portion of them) on the statutory purpose of this provision of the Multiemployer Pension Reform Act of 2014: ensuring that employers' withdrawal liability

payments stay commensurate with their unfunded vested benefits. R. 27 Pls.' Br. at 15–17. The Fund contends that by disregarding post-2014 employer contribution increases that did not reduce unfunded vested benefits to calculate the highest contribution rate, the limited purpose of § 1085(g)(3) is undermined. But ERISA is an "enormously complex and detailed statute that resolved innumerable disputes between powerful *competing* interests." *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993) (cleaned up) (emphasis added). The statutory scheme for multiemployer pension plans has been revisited by Congress numerous times to address those competing interests, as discussed above. The resolution of those competing interests is found in the statutory text itself, so courts cannot go beyond the bounds of the text in interpreting how Congress resolved those interests when tailoring withdrawal liability payments. The plain language of § 1085(g)(3) states that any post-2014 contribution is deemed required for the rehabilitation plan and must be disregarded in calculating withdrawal liability payments. § 1085(g)(3)(A), (B). But the statute also provides for exceptions to that rule. § 1085(g)(3)(B). If the Fund had amended its rehabilitation plan to increase future benefit accruals—and had this amendment certified by an actuary—then those post-2014 increases would have been included in determining the highest contribution rate for withdrawal liability payment. § 1085(f)(1)(b). Congress enacted the actuary certification as an apparent guardrail for plan amendments, and no nod to overall purpose can overcome that statutory text. The Fund did not obtain the actuary certification. In that absence, the post-2014 contribution increases made pursuant to the 2008 rehabilitation plan must be disregarded.

### III. Conclusion

The arbitrators' awards are vacated. The Fund is ordered to recalculate the withdrawal liability payments based on the contribution rate in effect as of December 31, 2014, that is, $328 per week. The Fund is ordered to refund to Event Media and Pack Expo the difference between the liability payments each employer has made to date using the $424 per week rate and the payments owed had the Fund used the 2014 contribution rate of $328 per week, plus interest.

ENTERED:


_____s/Edmond E. Chang___
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2024